### EX PARTE ALBITZ.

*No. 3486. Decided October 18.*

1. **Habeas Corpus—Murder—Evidence.**—See the statement of the case for evidence *held* insufficient as "proof evident" of murder in the first degree, and therefore not to support a judgment refusing bail.

2. **Same.**—And see the same for declarations of the relator made immediately subsequent to the homicide, *held* res gestæ and admissible in evidence; and for declarations made by him long prior to the homicide *held* not to be competent as evidence.

HABEAS CORPUS on appeal from the District Court of Harrison. Tried below before Hon. A. J. Booty.

The relator was held under an indictment charging him with the murder of W. H. Clark in Harrison County, Texas, on the 27th day of September, 1890. The order of the judge below on the hearing of the writ of *habeas corpus* refusing bail is reversed, and bail in the sum of $5000 is awarded.

The relator was the first witness who testified on this examination. The immediate cause of the witness's enmity toward deceased was the fact that the deceased had seduced the witness's wife, and on the 27th day of May, 1889, eloped with her from Marshall, Texas. On the night of May 28, 1889, the witness started with his children to St. Louis. When the train reached Jefferson, Texas, early on the morning of the 29th, the witness saw his wife and the deceased, the latter under arrest, standing on the depot platform. Witness left the car, approached his wife, and asked her if she wanted to go with him to St. Louis and there join her folks. She

replied that she did, and pointing to the deceased said, "That man has my trunk checks." Deceased thereupon handed the officer three checks and said to him, "Go with that man (meaning witness) and see that he does not take my trunk." Smarting under the injury already inflicted by the deceased, and indignant that deceased should accuse him by innuendo of being a thief, the witness struck the deceased with his fist and stepped back to draw his revolver, intending to kill deceased then, but was prevented by the officers who had deceased in custody. Witness with his wife and children then went on to St. Louis.

The witness returned to Marshall on the 29th day of December, 1889. He went to his hotel (the Capitol) on the morning of the 30th, and then learned that the deceased was boarding at the same hotel. Fearing a collision with deceased and determined to avoid it if possible, the witness left that hotel at once and took lodgings at another. Between that time and the fatal day—September 27, 1890—the witness frequently met and passed the deceased. On none of those occasions did either address the other, but the deceased invariably stared insolently into the witness's face, and smiled at him menacingly and insultingly. On one of those occasions the witness crossed the street to avoid meeting the deceased, but the deceased, for the apparent purpose of meeting witness, crossed to the same side of the street.

The killing occurred in front of the Capitol Hotel in Marshall, on Saturday night, September 27, 1890, immediately after supper. Witness, who had been confined to his room by sickness all day, went to that hotel that night to get supper. Passing out from supper, he came suddenly upon the deceased sitting in a chair against the wall near the hotel front door. Just as he discovered the deceased the latter, with his eyes fastened upon the witness, made a quick forward motion as though to rise from his chair. Under the belief that the deceased was about to attack him, and that his life was in danger, the witness drew his revolver and fired four shots at the deceased in rapid succession, the result being that deceased was killed. Witness was near-sighted, and wore near-sighted eye glasses. Witness was warned twice at least to look out for the deceased, who would do him serious injury upon the slightest opportunity. Influenced by these warnings, and believing from the sudden motion of the deceased that he intended to make a deadly assault upon the witness, the witness fired the fatal shots. The fatal shots were fired within a half second after the witness encountered the deceased.

A. W. Burson testified for the relator that in a conversation with deceased, on or about August 1, 1890, the latter asked him, "How is your glass-eyed friend, that son-of-a-bitch Albitz?" Witness replied, "I don't know that Albitz owes you a God damned cent." Deceased replied, "That will be seen." Witness repeated this conversation to the relator on the next day, and said to him: "Vic., from Clark's conversation with me I

believe that he intends to use you up. If you haven't a pistol I have one, and you had better go armed." A short while before the killing the witness met the deceased on the street, when the deceased, smiling maliciously, said to witness, "That debt has not been paid yet." Witness reported that occurrence to the relator, and again warned relator that in his, witness's, opinion the deceased intended, at the first opportunity, to do the relator up. The witness was with the relator when the deceased crossed the street, after witness and relator had crossed it, for the manifest purpose of meeting and passing the relator. As he passed he looked straight into the relator's face and smiled maliciously and insultingly. Clark's similar conduct on other occasions when meeting or passing the relator was proved by other witnesses.

J. W. Stacy was the next witness. His testimony in chief amounted to no more than that the relator was a day laborer and a poor man.

Cross-examined by the State, he testified that he was sitting in a chair near the deceased when the fatal shots were fired. He and deceased had been discussing electric appliances just before the shooting. Just before the first shot was fired a telegraph messenger spoke to witness about a telegram that had that day arrived for witness. In speaking to the messenger the witness looked away from deceased, and it was while talking to the messenger that the first shot was fired. Witness did not see deceased do anything or move his person, but he could have changed his position and could have got up from the chair without witness seeing him, while witness was talking with the messenger. At the time the second shot was fired the relator was standing immediately in front of deceased, his right arm extended. Witness did not observe a pistol in his hand, but saw the flash of the second shot. The witness did not see the deceased make a motion before the shooting, but he could have done so without witness observing it. Relator had not been out of the hotel more than a half second when the first shot was fired.

C. V. Fraley testified for the State that he arrested the relator two or three minutes after the shooting. When he hailed the relator the latter asked, "Is that you, Fraley?" Witness replied, "Yes; what about that shooting?" Relator replied, "I did it," and told witness why he did it. This is part of the evidence referred to in the second head note of this report.

John L. Phillips testified for the State that he met the relator on the inside of the Capitol Hotel door immediately before the shooting. He had a toothpick in his mouth, and was walking toward the door. The deceased was then sitting in a chair on the outside and near the door. On meeting the relator the witness shook hands with him and asked him: "What are you doing now? The same old job?" Witness then passed on and the relator passed out at the door near which deceased was sitting.

George Payne, head waiter at the Capitol Hotel, testified that about

Christmas, 1889, the deceased came to the hotel to board. The relator was boarding at that hotel, but was then absent. When witness assigned the deceased a seat at a particular table the deceased declined to take it, and told witness that he wanted a seat at the table usually occupied by the relator. Witness objected to assigning him to that table on the ground that he wanted no trouble in the hotel, and asked why he wanted a seat at that table. He replied that the relator struck him once in Jefferson, and that he wanted a seat at the same table to give him a chance to try it again, when, if he did, he, deceased, would "wipe up the floor with him." When the relator returned the witness told him that deceased was boarding at the hotel and had taken a seat at that table. The relator thereupon changed his boarding place. Witness did not tell the relator of the deceased's threat to "wipe up the floor" with him.

L. Greenleaf testified for the State that he entered the hotel just before the shooting and met the relator going towards the door. About the time witness reached the billiard room he heard the first shot. He then ran out of the hotel. The second shot was fired before he got out of the house. He saw the third and fourth shots fired about the time he reached the pavement. They were fired at a man who was then lying on the ground. That man was the deceased.

C. D. Kretz testified for the State that he examined the wounds on the deceased's person. One ball entered the neck on the right side and passed through. Another entered the left shoulder, and two the back.

The evidence referred to in the last head note as incompetent (and which was rejected on this hearing) was the testimony of Michaelson to the effect that early in the year 1890 the relator, in conversation with him about his children, then in an orphan asylum in St. Louis, told him how the deceased had broken up his family, adding that many of his friends had advised him to kill deceased, but that he had refused and would continue to refuse to do so; that he did not want deceased's blood on his hands, and that he had made every effort to avoid meeting the deceased.

*W. H. Pope, M. R. Greer* and *S. T. Scott,* for the relator.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.—In our judgment the proof is not evident that the applicant is guilty of a capital offense, and we hold that he is entitled to bail. We fix the amount of his bail at the sum of $5000. Upon his giving bail in said sum in accordance with the law he will be released from custody.

We are of the opinion that the statements made by applicant to C. V. Fraley two or three minutes after the homicide, and relating to the homi-

cide, constitute *res gestæ*, and are admissible in his behalf. His statements to Michaelson, however, made several months before the homicide,. are not, we think, admissible in his behalf.

*Ordered accordingly.*

Judges all present and concurring.